UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

LUVATA ELECTROFIN, INC., *et al.*                                    PLAINTIFFS


v.                                                      CIVIL ACTION NO. 3:11-CV-00398


METAL PROCESSING
INTERNATIONAL, L.P., *et al.*                                        DEFENDANTS


**MEMORANDUM OPINION**


This matter is before the court on several motions. First, the defendants have filed two

separate motions to dismiss: Defendants Roy Foster and Russ Meredith have moved to dismiss

for failure to state a claim (DN 11), while defendants Metal Processing International, L.P.,

("MPI") and Oklahoma Custom Coating, LLC, ("OCC") have moved to dismiss for lack of

personal jurisdiction and improper venue (DN 12). Additionally, the defendants have filed two

motions–one by MPI and OCC (DN 23) and one by Foster and Meredith (DN 24)–to stay

consideration of a motion for a preliminary injunction filed by the plaintiffs, Luvata Electrofin,

Inc., and Luvata Electrofin Texas, Inc., (both referred to collectively herein as "Luvata").

Finally, Luvata has moved to expedite discovery on the matters raised in the preliminary

injunction motion (DN 26).

**I.**

The following allegations are taken from Luvata's complaint against MPI, OCC, Foster

and Meredith. Luvata is in the business of electrocoating, or E-coating, coils used in the heat

transfer industry, such as radiators in automobiles and commercial condenser and evaporator

coils used in buildings' heating, ventilation, and air conditioning systems (Compl., DN 1 ¶¶ 18, 22). To E-coat a coil, it is submerged in a coating/water bath and electricity is used to deposit the coating on the coil (*id.* ¶ 23). While E-coating itself is not a unique process to Luvata, Luvata spent many years and over $1,000,000 to develop a "proprietary process" for E-coating; the name of that process is ElectroFin, and the name has been registered as a trademark (*id.* ¶¶ 20-21, 25). Luvata alleges that its unique and "particular combination of steps, processes and control conditions utilized in each step" provide Luvata with a competitive advantage in the E-coating industry and constitute "Trade Secrets" (*id.* ¶ 25). Luvata provides a list of its trade secrets, but states that its trade secrets are not limited to those in the list (*id.* ¶ 26).[1]

---

[1] The following is the list of Luvata's alleged trade secrets provided in Luvata's complaint:

a. designing and creating its own racking and fixture system;

b. the manner in which it grounds the coils (which ensures coverage of the coil), including both the equipment that Luvata has designed and the location(s) where it places the grounding equipment during the process;

c. the chemical bath conditions used to clean the grounding equipment and the step in the process where that cleaning is done;

d. the time/temperature combination used in its alkaline cleaning step;

e. the recipe Luvata uses to determine the time/temperature/voltage/amps combination for a particular load of coils during the electrocoating step;

f. the percentage of solids Luvata uses during the electrocoating step;

g. the ratio of resin to pigment Luvata uses to make the epoxy polymer e-coat (paint) used to coat the coils during the electrocoating step;

h. the computerized control system designed to implement the time/temperature/voltage/amps recipe utilized to during [sic] the electrocoating step;

i. the purging process Luvata uses during the electrocoating step;

j. the five-angle spray technique utilized during the topcoat step;

continue...

Luvata claims that no company it competes with uses an E-coating process that is the same as the process used by Luvata, and that its trade secrets cannot be reverse engineered (Compl., DN 1 ¶¶ 29-30). It also states that it has taken steps to protect its trade secrets, such as requiring visitors to sign in at the lobby of its plants, requiring visitors to be accompanied by a Luvata employee while on its premises, requiring visitors exposed to the manufacturing process to sign confidentiality agreements, surrounding the manufacturing facilities with fencing and barbed wire, maintaining video surveillance of the manufacturing facilities, and requiring employees to sign statements acknowledging that they may have access to confidential information (*id.* ¶ 31).

Foster began working in the maintenance department of Luvata's Louisville, Kentucky plant in March 2004 (Compl., DN 1 ¶¶ 32-33). He was promoted multiple times, ultimately reaching the position of Production Supervisor for the entire Louisville plant (*id.* ¶ 34). In August 2010, Foster resigned from Luvata, and shortly thereafter began working for MPI (*id.* ¶ 37). MPI is a subsidiary of OCC (*id.* ¶ 5). Both companies are in the business of coating metallic items (*Id.* ¶¶ 46, 48). Luvata alleges, "[u]pon information and belief," that MPI hired Foster to set up an E-coating line to compete with Luvata (*id.* ¶ 48).

Meredith was also an employee at Luvata's Louisville plant, where he was "intimately involved in running the electrocoating process" (Compl., DN 1 ¶¶ 39-40). Luvata claims that "one week after Foster left Luvata, Meredith logged in on Foster's Luvata computer and

---

[1]...continue
   k. the combination of these processes into a single manufacturing line; and

   l. the reasoning behind the processes Luvata uses

(Compl., DN 1 ¶ 26).

reviewed a number of files that contain Luvata's Trade Secrets" (*id.* ¶ 50). From August of 2010 until April of 2011, Meredith and Foster talked on the phone over 30 times (*id.* ¶ 50). In April of 2011, Meredith resigned from Luvata (*id.* ¶ 42). Luvata alleges that, prior to leaving Luvata, Meredith accessed documents containing "Luvata's Trade Secrets, financial records, and customer records, and downloaded some of those documents to external hard drives, thumb drives, or other removable media" (*id.* ¶ 52). Shortly after Meredith left Luvata, he joined Foster at MPI (*id.* ¶ 43).

Luvata claims that, the same month Meredith left Luvata, Foster contacted Ralph Rice, Luvata's General Manager, and stated that MPI was building an E-coating line to compete with Luvata (Compl., DN 1 ¶ 54). Foster supposedly stated that MPI's E-coating line would be based on everything Foster learned at Luvata (*id.*). Around that same time, a Luvata customer allegedly told Luvata that MPI had called the customer to provide information regarding the new MPI E-coating line (*id.* ¶ 55). Additionally, MPI and OCC both began advertising their E-coating capabilities on their websites (*id.* ¶¶ 56-58). Luvata made the following allegations based upon information and belief: that MPI ordered the same computerized control system to run its E-coating line as that used by Luvata; that MPI is building tanks for the E-coating process that "are based, in whole or in part, on the tanks used by Luvata"; that MPI "used and plans to use[] Luvata's Trade Secrets to develop and operate its E-coating line"; and that Foster and Meredith provided MPI and OCC with Luvata's "Trade Secrets, customer information, and financial data" (*id.* ¶¶ 59-62).

Luvata brought a claim for breach of fiduciary duty against Foster and Meredith for accessing and using Luvata's financial and customer information for their personal benefit and

- 4 -

the benefit of MPI and OCC. Luvata also brought a claim for misappropriation of trade secrets under the Kentucky Uniform Trade Secrets Act ("KUTSA")  against Foster, Meredith, MPI, and OCC. Luvata sought injunctive relief and monetary damages, including punitive damages, as redress for the alleged wrongs.

MPI and OCC have now moved to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, or, alternatively, pursuant to Rule 12(b)(3) for improper venue. Meanwhile, Foster and Meredith have moved to dismiss the claims against them pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Additionally, after Luvata filed a motion for a preliminary injunction, both sets of defendants moved to stay consideration of that motion until after their motions to dismiss had been decided. Finally, Luvata has moved this court for expedited discovery concerning the preliminary injunction. We turn first to MPI and OCC's argument against personal jurisdiction.

## II.

### A.

The plaintiff bears the burden of establishing personal jurisdiction. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). When a district court resolves a motion to dismiss for lack of personal jurisdiction by relying on written submissions and affidavits rather than holding an evidentiary hearing, the plaintiff is only required to make a prima facie showing that personal jurisdiction exists to defeat the motion. *Id.*; *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). To meet that burden, the plaintiff must "establish[] with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction." *Neogen*, 282 F.3d at 887 (quoting *Provident Nat'l Bank*

*v. California Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 2987)). Without a hearing, the

court must construe the pleadings and affidavits in the light most favorable to the plaintiff,

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996), and cannot "consider facts

proffered by the defendant that conflict with those offered by the plaintiff." *Neogen*, 282 F.3d at

887.

　　　　To determine whether personal jurisdiction exists, a federal court applies the law of the

forum in which it sits, subject to the requirements of constitutional due process. *Kerry Steel, Inc.*

*v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997). While courts had previously held that

Kentucky's long-arm statute, KRS § 454.210, extends to the outer reaches of due process, *see,*

*e.g.*, *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 730 F. Supp. 2d 683, 689 (W.D.Ky.

2010), the Kentucky Supreme Court has recently clarified that the statute is not, *per se,*

coextensive with the limits of federal due process. *Caesars Riverboat Casino, LLC v. Beach*, 336

S.W.3d 51, 56 (Ky. 2011). Instead, the Kentucky Supreme Court held, a defendant's conduct and

activities must fall within one of the nine specific provisions in the statute before a Kentucky

court may exercise personal jurisdiction over a defendant. *Id.* Thus, this court first turns to the

question of whether this court can exercise personal jurisdiction over MPI and OCC under the

Kentucky long-arm statute; only if it does will the court turn to the constitutional inquiry.

B.

　　　　In its papers opposing the Rule 12(b)(2) motion to dismiss, Luvata offered an affidavit

from Ralph Rice, the general manager of Luvata (Rice Aff., DN 15-1 ¶¶ 1, 3). According to

Rice's affidavit, he, Foster, and Meredith attended an E-coating conference in 2010 in Louisville

on behalf of Luvata (*id.* ¶¶ 7-8). Sam Adkisson attended the conference on behalf of MPI and

- 6 -

OCC (*id.* ¶ 9).[2] During the conference, Foster and Meredith told Rice that Adkisson had approached them and discussed hiring them to work for MPI or OCC (*id.* ¶ 10). Foster and Meredith also reported to Rice that Adkisson had asked them about Luvata's E-coating procedures (*id.* ¶ 11). Meredith and Foster both told Rice that they had "rebuffed Adkisson's solicitations" (*id.* ¶ 12). A few months later, Foster resigned from Luvata to work for MPI (*id.* ¶ 13). After Foster left Luvata, Meredith spoke to him on a phone paid for by Luvata at least 30 times (*id.* ¶ 19). Meredith also had phone conversations with someone at a phone number registered to Adkisson's son less than one month before Meredith left Luvata to work for MPI (*id.* ¶ 21).

Luvata also provided this court with the affidvait of Michael G. McCartney, a computer forensics specialist. McCartney's company performed an analysis of Foster's computer at Luvata, which showed that after Foster left Luvata, Roy Meredith logged into Foster's computer two times: once in September of 2010 and once in April 2011 (McCartney Aff., DN 15-2 ¶¶ 1-7). In September 2010, Meredith accessed files and used a program to transfer various settings for computer programs (*id.* ¶ 8-9). On April 11, 2011, Meredith's last day at Luvata (Rice Aff., DN 15-1 ¶ 17), Meredith used a program that allowed a user to copy files from the computer to a CD and also used a program that cleaned "unnecessary files" from the computer's hard disk (McCartney Aff., DN 15-2 ¶¶ 10-11). Additionally, an analysis of Meredith's own computer at Luvata showed that he had attached 17 USB thumb drives to it, 6 of which were on three dates

---

[2] According to an affidavit made by Adkisson and submitted by MPI and OCC, Adkisson was the general partner in MPI and the managing member of OCC, and was responsible for the management of both companies (Adkisson Aff., DN 12-2 ¶ 1).

between February and April 2011; additionally, on April 10, 2011, Meredith had used the cleaning program on his own computer (*id.* ¶¶ 12-13).

C.

Luvata asserts that the allegations in its complaint and the facts in its affidavits show that MPI and OCC "began their solicitation of Foster and Meredith in Kentucky, used Foster and/or Meredith to access Luvata's trade secrets in Kentucky, and have now started to use those trade secrets" (DN 15 at 6). Luvata argues that those facts give rise to jurisdiction over MPI and OCC under the Kentucky long-arm statute, which provides that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from" any of nine separate categories. KRS § 454.210(2)(a). Luvata points to the following two categories as being applicable here: "1. Transacting any business in this Commonwealth," and "3. Causing tortious injury by an act or omission in this Commonwealth." However, Luvata's pleadings and affidavits do not set forth sufficient contacts with Kentucky by MPI and OCC to meet the requirements of the Kentucky long-arm statute.

To begin, as noted above, Luvata suggests that Adkisson attempted during the E-coating convention in Louisville to lure Foster and Meredith to MPI or OCC and to learn about Luvata's business. But those facts, by themselves, are insufficient to establish jurisdiction under any of the categories in the Kentucky long-arm statute. By the statute's very terms, the claim being asserted must "aris[e] from" the facts that fit within one of the categories. KRS § 454.210(2)(a), (2)(b). The Kentucky Supreme Court recently explained that the term "arising from" in the Kentucky long-arm statute meant that "the wrongful acts of the defendant alleged in the plaintiff's complaint must originate from the actions or activities that form the applicable statutory

- 8 -

predicate for assertion of long-arm jurisdiction." *Caesars*, 336 S.W. 3d at 59. The Kentucky Supreme Court thus stated that jurisdiction is properly exercised if there is a "reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm jurisdiction."

In this case, the wrongful acts alleged against MPI and OCC are the acquisition by improper means of Luvata's trade secrets, KRS § 365.880(1), (2). The wrongful acts are not related to the hiring of Foster and Meredith; there was nothing to indicate that hiring them was improper in any way. Indeed, there is not even an allegation that Foster and Meredith violated a non-competition agreement by leaving to work for MPI. And, as per the Rice affidavit submitted by Luvata, Adkisson's attempt to hire Foster and Meredith at the E-coating convention actually failed. Nor is there a reasonable and direct nexus between the wrongful acts alleged in the complaint and Adkisson's questioning of Foster and Meredith at the conference regarding Luvata's E-coating procedures. As with the attempted solicitations for employment, the Rice affidavit states that Adkisson's attempt to obtain information from Foster and Meredith was unsuccessful at that time. Simply put, Adkisson's failed attempts to solicit Foster and Meredith to work for MPI and to learn about Luvata's E-coating business do not bear a "reasonable and direct nexus" to Luvata's misappropriation of trade secrets claims against MPI and OCC.

Luvata contends that personal jurisdiction is proper because the "wheels were set in motion for MPI and OCC to misappropriate Luvata's trade secrets when Adkisson first solicited Foster and Meredith" at the E-coating conference. However, as the Kentucky Supreme Court made clear in *Caesars*, 336 S.W.3d at 59, a "but for" test is inappropriate for assessing whether a claim arises from facts that would otherwise satisfy a statutory predicate for personal

- 9 -

jurisdiction. In that case, the Kentucky Supreme Court rejected the plaintiff's argument that a slip-and-fall accident at a casino in Indiana arose from the casino's transaction of business in Kentucky via advertising and promotional campaigns because the casino's campaigns in Kentucky contributed to the plaintiff's presence at the casino. *Caesars*, 336 S.W.3d at 59. The Kentucky Supreme Court found that the plaintiff's slip and fall was "far too attenuated" from the advertising and promotional campaigns of the casino to fit within the definition of "arising from." *Id.* Luvata's argument that its misappropriation of trade secrets claim arises from Adkisson's initial, unsuccessful attempt to hire Foster and Meredith at the E-coating convention because that is when the "wheels were set in motion" is just the type of "but for" argument that the Kentucky Supreme Court rejected in *Caesars*.

Having concluded that personal jurisdiction over MPI and OCC is improper under the Kentucky long-arm statute on the basis that Adkisson spoke to Foster and Meredith at an E-coating convention in Louisville, the court is left to evaluate whether those companies acted in Kentucky in any other way that would support the exercise of personal jurisdiction. Luvata argues that Meredith's gathering of Luvata's confidential information by downloading that information from his own and Foster's computers rendered jurisdiction over MPI and OCC proper under the Kentucky long-arm statute. Luvata reasons that the downloading occurred in Kentucky, and that it is "immediately apparent" that Meredith was acting as an agent of MPI and OCC at the time of the downloading.

To be sure, the Kentucky long-arm statute provides that courts may exercise personal jurisdiction over persons–which includes corporations–who act "directly or by an agent" to "caus[e] tortious injury by an act or omission in this Commonwealth." KRS § 454.210(2)(a). The

problem with Luvata's argument, however, is that it is premised on conjecture as to whether Meredith was acting as an agent of MPI or OCC when he downloaded the information. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 50 (quoting *CSX Transp., Inc. v. First Nat'l Bank of Grayson*, 14 S.W.3d 563, 566 (Ky. Ct. App. 1999)). "[T]he right to control is considered the most critical element in determining whether an agency relationship exists." *Id.*

Here, Meredith's actions in downloading the information occurred prior to the time Meredith began working for MPI. Thus, there is no employer-employee relationship from which it may be inferred that Meredith was acting as an agent of MPI or OCC. Instead, Luvata relies on the allegations that Meredith often spoke to Foster once Foster began working at MPI; that Meredith spoke to Adkisson prior to accessing Foster's computer and prior to downloading files from his own computer; and that not long after downloading files from his own computer, Meredith resigned from Luvata to work at MPI.

One could speculate from Luvata's factual allegations that something fishy was occurring between MPI and Meredith, including the possibility that Meredith had agreed to work subject to MPI's control to obtain information about Luvata's E-coating line for the latter's benefit. But that would only be conjecture. None of the pleadings or affidavits put forth by Luvata contain factual allegations or averments that actually show that MPI controlled Meredith, issued any instructions to Meredith to obtain Luvata's trade secrets, or came to any sort of agreement with Meredith that he would obtain Luvata's trade secrets for MPI. Nor is there any allegation showing that MPI later ratified Meredith's actions in downloading Luvata's trade secrets. At

most, the pleadings simply show that it was possible that Meredith was acting as MPI's agent. That is not enough for this court to haul MPI into a Kentucky court under the Kentucky long-arm statute.

Indeed, even taking all of Luvata's pleadings and affidavits as true, it is still possible that Meredith decided unilaterally that he would bring information to MPI from Luvata, perhaps believing that doing so would immediately increase his value to his new employer. And, given that Meredith was negotiating employment with Adkisson's company, MPI, it is less than surprising that he would have spoken with Adkisson shortly before he left Luvata. Likewise, given that Meredith had worked at Luvata with Foster and very well could have been good friends, it is hardly of note that the two men kept in contact after Foster left to work at Luvata. In fact, Foster could have been repeatedly attempting to convince his friend and former co-worker to leave Luvata and take a job with Foster's new employer. As explained above, attempts by representatives of MPI to hire Meredith do not bear a "reasonable and direct" nexus to Luvata's misappropriation of trade secrets claim.

Because Luvata has not put forth sufficient facts for this court to conclude that, at the time Meredith allegedly downloaded trade secrets, he was under the control of MPI, acted pursuant to instructions from MPI, or had come to an agreement with MPI to steal Luvata's trade secrets, there is no basis for exercising jurisdiction over MPI, much less over OCC. And because neither MPI or OCC has engaged in any other acts in Kentucky that bear a "reasonable and direct nexus" to Luvata's claims for misappropriation of trade secrets, the Kentucky long-arm statute does not permit the exercise of jurisdiction over those companies. Thus, their motion to dismiss for lack of personal jurisdiction will be granted.

### III.

### A.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Foster and Meredith argue that the complaint fails to state a claim as to them. They contend that the claims against them should be dismissed with prejudice.[3] Upon a motion to dismiss for failure to state a claim, a court "must construe the complaint in the light most favorable to plaintiff" and "accept all well-pled factual allegations as true." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). To survive a motion to dismiss, the "complaint must contain either direct or inferential allegations respecting all material elements" of the offense. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (internal question marks ommitted). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A plaintiff must provide more than "labels and conclusions," *Twombly*, 550 U.S. at 555, or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, a court considering a motion to dismiss can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. After doing so, the court should determine whether the remaining well-pled factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*

---

[3] Foster and Meredith state that, for the purposes of the motion to dismiss only, they accept Luvata's contention that Kentucky law applies.

B.

In order to prevail under KUTSA, a plaintiff is required to show that the information it seeks to protect is a trade secret and that the information was misappropriated. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 794 (W.D.Ky. 2001). To show that the information constitutes a trade secret, the plaintiffs must show "that the information (1) has independent economic value, (2) is not readily ascertainable by proper means, and (3) was the subject of reasonable efforts to maintain its secrecy." *BDT Products, Inc. v. LexMark Int'l, In*c., 274 F. Supp. 2d 880, 890 (E.D.Ky. 2003) (quoting *In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1375 (N.D.Ga. 2003)); *see* KSR § 365.880(4).

Luvata's complaint alleges sufficient facts to show that it possesses trade secrets. For instance, the complaint sets forth specific aspects of the E-coating process that Luvata claims are trade secrets (Comp., DN 1 ¶ 26). The complaint also alleges that no other company uses the precise process and conditions Luvata uses to E-coat coils, and further, that the particular processes Luvata uses provide it with a "competitive advantage" in the industry (*id.* ¶ 25). Thus, Luvata has alleged that its trade secrets have "independent economic value." Luvata also states in its complaint that its trade secrets cannot be reverse engineered (*id.* ¶ 30), which is sufficient to show that the trade secrets are "not readily ascertainable by proper means." And, finally, Luvata sets forth the steps it has taken to protect its trade secrets, such as requiring visitors to the facility to sign in, be accompanied by a Luvata employee at all times, and to sign confidentiality agreements. Luvata also alleges that it has secured its facility with barbed wire, maintains video surveillance of the facility, and requires employees to acknowledge that they may have access to confidential information (*id.* ¶ 31).

- 14 -

In fact, Foster and Meredith largely do not challenge that Luvata has adequately pled that it possesses trade secrets. Instead, Foster and Meredith argue that Luvata's complaint fails to state a claim because it makes insufficient factual allegations that the trade secrets were misappropriated. Thus, we turn to that element of the claim.

KUTSA defines misappropriation as follows:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    1. Used improper means to acquire knowledge of the trade secret; or

    2. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

        a. Derived from or through a person who had utilized improper means to acquire it;

        b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    3. Before a material change of his position, knew or had reason to know that it was a trade secret and the knowledge of it had been acquired by accident or mistake.

KRS § 365.880(2).

Foster and Meredith argue that, inasmuch as Luvata does not allege how MPI and OCC used Luvata's trade secrets, the complaint fails to state a misappropriation of trade secrets claim. Foster and Meredith argue that it is pure conjecture on Luvata's part that the defendants are using Luvata's trade secrets, and urge this court to find that "Luvata is simply upset that

Defendants are competing in the electrocoating industry." Foster and Meredith contend that Luvata is simply assuming that because MPI is now competing with Luvata, MPI misappropriated Luvata's trade secrets, which is nothing more than impermissible conjecture. But, while Foster and Meredith are correct that purely conclusory allegations need not be considered by the court in assessing the sufficiency of the complaint, there are sufficient factual allegations that are not conclusory from which reasonable inferences may be drawn that the defendants misappropriated Luvata's trade secrets.

As an initial matter, this court notes that, while Foster and Meredith focus on the sufficiency of the factual allegations that MPI actually used the trade secrets, the statute does not define misappropriation solely in terms of actual "use" of the secrets. Instead, the statute makes clear that "[d]isclosure" of a trade secret is sufficient, as is acquisition through improper means. KRS § 365.880(2); *Fastenal*, 609 F. Supp. 2d at 672 (quoting *KCH Servs., Inc. v. Vanaire, Inc.*, 2008 WL 4401391 (W.D.Ky 2008)) ("The defendants misappropriated a trade secret if they used it without proper consent, *if the trade secret was disclosed improperly*, or if it was acquired through improper means" (emphasis added)). In short, while allegations of actual use of a trade secret without proper consent would be sufficient to state a claim, allegations of actual use are not strictly required to state a claim.

With that in mind, we turn to the analysis of the allegations, taking them as true and drawing all reasonable inferences in Luvata's favor, as we must. Doing so, this court finds that Luvata's complaint sets forth sufficient allegations to state a claim. Specifically, Luvata's complaint has set forth sufficient facts that allow for the conclusion that Foster and Meredith misappropriated Luvata's trade secrets by disclosing Luvata's trade secrets without express or

- 16 -

implied consent and knowing, or at least having reason to know, that their knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. KRS § 365.880.

We begin with the allegations establishing that Foster and Meredith had reason to know that they acquired Luvata's trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use. Luvata alleged that its employees–including Foster and Meredith–signed an Employee Handbook acknowledging that "they may have access to confidential information" (Comp., DN 1 ¶¶ 31, 38, 44). It also alleges that it was during the course of their employment with Luvata that Foster and Meredith were exposed to Luvata's trade secrets (*id.* ¶ 35, 41). Further, the complaint alleges that, prior to leaving Luvata, Meredith accessed various documents containing Luvata's trade secrets and downloaded some of those documents to removable media devices (*id.* ¶ 52). It is reasonable to think that, as Luvata employees, and specifically ones who allegedly received notice that their jobs may entail access to confidential information, Foster and Meredith had good reason to know that Luvata would like to keep its process for E-coating a secret and that Luvata would not grant permission for its employees to give competing companies information concerning those processes. And Meredith's alleged downloading of documents containing Luvata's trade secrets prior to leaving Luvata allows for the inference that he was covertly accessing those documents with the understanding that they were not meant for wide-spread distribution.

Thus, we turn to the next question: whether the complaint sufficiently alleges facts showing that Foster and Meredith disclosed Luvata's trade secrets without express or implied consent. As an initial matter, Luvata has specifically alleged that "Foster and Meredith provided

MPI and its parent company, [OCC], with Luvata's Trade Secrets, customer information, and financial data" (Comp., DN 1 ¶ 62). However, that statement would appear to be nothing more than a recitation of the element of the cause of action, which, under *Ashcroft v. Iqbal*, 556 U.S. at 678, is insufficient to state a claim for relief.

But the complaint does not rest solely on that allegation of disclosure. Rather, the complaint sets forth sufficient allegations, which, taken as true, allow for a reasonable conclusion that Foster and Meredith did provide MPI with Luvata's trade secrets without Luvata's consent. Those allegations include that after Foster left Luvata to begin working for MPI, Meredith logged into Foster's old computer at Luvata to review files containing Luvata's trade secrets. Additionally, during the time period when Foster was working for MPI and Meredith was working for Luvata, Foster and Meredith maintained extensive phone contact, making over 30 calls to each other in that eight months. The complaint further alleges that Meredith downloaded documents containing Luvata's trade secrets to thumb drives or external hard drives. Then, Meredith left Luvata to join Foster at MPI, right around the same time that MPI began building an E-coating line. Luvata additionally alleges that MPI has ordered the same computerized control system for its E-coating line as that used by Luvata and which Luvata has alleged is one of its trade secrets, as well as that MPI is building tanks based in whole or in part on the tanks used by Luvata.

The allegations enumerated above are sufficient to plausibly give rise to an entitlement to relief. First, the allegations are plainly sufficient to suggest that Meredith was accessing and downloading Luvata's trade secrets when he accessed Foster's computer and downloaded files from his own computer to an external media drive. Not only that, but the allegations also

plausibly suggest that Meredith did that for the purpose of providing those trade secrets to MPI. From there, it is reasonable to conclude that Meredith actually followed through and disclosed to MPI the trade secrets he had gathered with the intent of providing them to MPI. After all, he left Luvata to begin working at MPI, which allegedly ordered the same computerized control system as that used by Luvata, and which Luvata has alleged was a trade secret. MPI also allegedly built certain tanks based on the tanks used by Luvata. Thus, the factual allegations in the complaint "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face" against Meredith. *Twombly*, 550 U.S. at 555, 570.

Nor does Foster fare any better on his motion to dismiss. The allegations with respect to Foster set forth that Foster had access to trade secrets while at Luvata; that Foster had extensive contact with Meredith, who viewed files on Foster's old computer at Luvata and who was gathering Luvata's trade secrets on removable media; and that Foster actually called Luvata's general manager, Ralph Rice, and admitted that he was helping MPI build an E-coating line "based on everything he had learned from Luvata" (Comp., DN 1 ¶ 54). Thus, the allegations plausibly suggest that Foster had disclosed Luvata's trade secrets to MPI for their use in developing an E-coating line. And, as with Meredith, the alleged fact that MPI had ordered the same computer system as Luvata used and was building certain tanks based on those used by Luvata further suggests that Foster disclosed Luvata's trade secrets, as he implied he had done when he spoke to Rice.

Foster and Meredith contend that Luvata's complaint alleges 12 specific trade secrets, but fails to identify which of those trade secrets were misappropriated. Simply put, Foster and Meredith's argument that Luvata must state with particularity every trade secret that was

allegedly misappropriate puts an onus upon Luvata that is greater than what is required at this stage of the litigation. As explained above, Luvata has alleged enough facts, with enough particularity, to state a plausible claim to relief and to provide notice to the defendants of the basis for the claims. Rule 8 of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," not the level of detail the defendants contend is necessary. Indeed, for Luvata to state with particularity which of its trade secrets it believed MPI was planning to use would require Luvata to have a level of knowledge concerning MPI's business that would render it nearly impossible to bring a claim. Instead, so long as Luvata can put forth general categories of its trade secrets and provide the type of factual allegations detailed above that allow for the reasonable inference that Meredith and Foster improperly disclosed some of those trade secrets to MPI, Luvata has done all that is required to survive a motion to dismiss. The court also notes that the complaint was filed within the ambit of Federal Rule of Civil Procedure 11(b) and its requirement that an attorney conduct an "inquiry reasonable under the circumstances" to assure himself or herself that there is evidentiary support, or will likely be evidentiary support after a reasonable opportunity for discovery, for the factual contentions in the pleading.

Finally, Foster and Meredith argue that, despite Luvata's legal claims, Luvata is simply trying to enforce a non-competition agreement against Foster and Meredith even though Foster and Meredith never signed such an agreement. Similarly, Foster and Meredith state that Luvata is "simply upset that Defendants are competing in the electrocoating industry." Perhaps Foster and Meredith's view will ultimately prove true on the facts, and Luvata will be unable to show anything other than that Foster and Meredith chose to move to a competing company that

developed their E-coating process in a perfectly legitimate manner. However, the only question before the court at this time is whether the factual allegations in the complaint, taken as true and drawing all reasonable inferences in Luvata's favor, plausibly state a claim against Foster and Meredith under KUTSA. As explained above, the court finds that they do, and thus will decline to dismiss those claims.

C.

The court now turns to the breach of fiduciary duty claims Luvata asserts against Foster and Meredith. Foster and Meredith argue that the breach of fiduciary duty claims must be dismissed on the grounds that they are preempted by KUTSA and, alternatively, that the allegations in Luvata's complaint are insufficient to state a claim. Because the court finds that the breach of fiduciary duty claims are preempted, it will not address Foster and Meredith's alternative argument that the allegations in the complaint are insufficient.

By its terms, KUTSA "replaces conflicting tort, restitutionary, and other law of [Kentucky] providing civil remedies for misappropriation of a trade secret." KRS § 365.892. However, KUTSA does not preempt "[c]ontractual remedies" or "[o]ther civil remedies that are not based upon misappropriation of a trade secret." KRS § 365.892. Thus, one court has explained that KUTSA is not meant "to usurp other claims *related* to the trade secrets claims but arising out of additional or different facts." *FBK Partners, Inc. v. Thomas*, 2010 WL 4940056, at *3 (E.D.Ky. Nov. 30, 2010). In that case, the court found that a breach of fiduciary duty claim was preempted to the extent that it rested on the defendant's misappropriation of trade secrets. *Id.* at *4. However, the court found in that case that there were factual allegations in support of the breach of fiduciary duty claim that were distinct from any trade secrets claim, namely that the

- 21 -

defendant breached his fiduciary duty by planning to start a competing company while still employed by the plaintiff and by soliciting a different employee of the plaintiff's while the defendant and that employee still worked for the plaintiff. *Id.*; *see also Greif, Inc. v. MacDonald*, 2007 WL 679040, at *2 (W.D.Ky. Mar. 1, 2007) (uniform trade secrets acts preempt fiduciary duty claims premised on misappropriation of trade secrets, but not fiduciary duty claims premised upon other distinct factual bases).

      Here, Count I of Luvata's complaint states that Foster and Meredith owed Luvata a fiduciary duty, which they breached by "accessing and using Luvata's financial and customer information for their personal benefit and the benefit of MPI and [OCC]" (Complaint, DN 1 ¶¶ 64-65). Luvata argues that because it did not deem its financial and customer information to be a trade secret in its complaint, the allegation that Foster and Meredith misappropriated that information in violation of their fiduciary duty is not preempted by KUTSA.

      However, financial and customer information that derives economic value from not being "generally known or readily ascertainable by proper means" is properly considered to be a trade secret. *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 671-672 (E.D.Ky. 2009); *see ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005); *FBK Partners, Inc. v. Thomas*, 2010 WL 4940056, at *3-*4 (issue of fact for jury whether information about materials, their costs, and the way that a company calculates the appropriate amount to charge a customer constituted a trade secret). Thus, Luvata's claim that Foster and Meredith accessed and used its financial and customer information for the defendants' benefit is nothing more than a claim that Foster and Meredith misappropriated pieces of information that constitute trade secrets, assuming the information derives economic

value from not being readily ascertainable. It makes no difference that Luvata chose not to define those pieces of information as "trade secrets" in its complaint. Instead, because those pieces of information can be trade secrets, a fiduciary duty claim premised on the misappropriation of them is preempted by KUTSA. Accordingly, Luvata's breach of fiduciary duty claims will be dismissed as preempted.

## IV.

### A.

On May 14, 2012, Luvata filed a motion for a preliminary injunction "preventing the defendants from (1) using any Luvata customer, vendor, or financial information Foster and/or Meredith learned while employed by Luvata, and (2) using or further disclosing Luvata's Trade Secrets." Thereafter, the corporate defendants, MPI and OCC, filed a motion to stay briefing and consideration of Luvata's motion for a preliminary injunction, as did the individual defendants, Foster and Meredith.

The main thrust of the defendants's arguments in support of their motions to stay is that Luvata's motion for a preliminary injunction should not be briefed and considered until after this court has rendered a decision on the defendants' motions to dismiss. As this court has resolved those motions to dismiss, the defendants' motions to stay are rendered moot and will therefore be denied.[4]

---

[4] Both of the defendants' motions, in arguing that a stay would not prejudice Luvata, argue that Luvata has failed to act diligently in filing its preliminary injunction motion. Luvata contends otherwise in its response. The court will decline to address this point of contention at this time because the motions to stay are moot and because the preliminary injunction motion is not yet before the court.

B.

In requesting a stay, the defendants also note that a response to Luvata's preliminary injunction motion will entail significant discovery. For instance, Foster and Meredith state that Luvata relied on the declarations of seven individuals in support of the preliminary injunction motion; Foster and Meredith contend that they would be entitled to take the depositions of each of those individuals as well as engage in other discovery before responding to the motion.

In its response to the defendants' motion to stay, Luvata stated that it agreed that discovery was necessary on the factual issues raised in its preliminary injunction motion, but cross-moved to expedite that discovery. Specifically, Luvata sought a court order requiring the issuance of documentary discovery demands within 15 days after the order, the responses to those demands within 30 days, inspection of the defendants' E-coating facility within 45 days of the order, and the depositions of Foster, Meredith, and Adkisson within 75 days of the order.

The defendants, responding to Luvata's motion to expedite, state that Luvata's proposed discovery schedule is "agressive and practically unworkable." The defendants propose that, rather than putting forth a competing proposed schedule, the court schedule a conference to establish the procedures and deadlines for discovery and briefing concerning Luvata's motion for a preliminary injunction. Luvata, in its reply papers, notes that it believes its proposed discovery schedule is appropriate, but nonetheless agreed that a scheduling conference would be helpful.

Accordingly, this court will grant Luvata's motion for expedited discovery to the extent of ordering a scheduling conference to be held before the Magistrate Judge concerning the scope of and deadlines for discovery on, and for briefing of, Luvata's preliminary injunction motion.

## V.

In sum, Luvata has not set forth a prima facie showing that personal jurisdiction over MPI and OCC is proper, and, accordingly, the motion to dismiss made by those parties will be granted. As for Foster and Meredith's motion to dismiss, it will be granted in part to the extent of dismissing as preempted the breach of fiduciary duty claims, but it will be denied as to the misappropriation of trade secrets claims. Because this court has rendered a decision on the motions to dismiss, the motion to stay Luvata's preliminary injunction motion will be denied and Luvata's motion to expedite discovery will be granted to the extent of ordering a scheduling conference to be held before Magistrate Judge Dave Whalin.

A separate order will be entered in accordance with this opinion.

September 7, 2012

**Charles R. Simpson III, Judge**
**United States District Court**

D03